Robert R. Kinas (#011560)
Jonathan M. Saffer (#022004)
Nathan G. Kanute (#023944)
SNELL & WILMER L.L.P.
One South Church Avenue
Suite 1500
Tucson, AZ 85701-1630
Telephone: (520) 882-1236
Email:  rkinas@swlaw.com
        jmsaffer@swlaw.com
        nkanute@swlaw.com
Attorneys for MSDW 2000-Life 1 Stucky Store, LLC

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| In Re: | Chapter 11 Proceeding |
|---|---|
| C&H ARIZONA-STUCKY, LLC | Case No. 2:10-bk-21165-RJH |
| Debtor. | **OBJECTION TO DEBTOR'S PLAN OF REORGANIZATION DATED AUGUST 18, 2010** |
| | **Hearing Date:** January 20, 2011<br>**Hearing Time:** 11:00 a.m.<br>**Location:** 230 N. First Ave.<br>Phoenix, AZ<br>Courtroom 603 |

MSDW 2000-Life 1 Stucky Store, LLC ("MSDW"), a secured creditor and party-in-interest, hereby submits its objection to the *Plan of Reorganization by the Debtor dated August 18, 2010* (the "Plan") filed by Debtor C&H Arizona-Stucky, LLC ("C&H" or "Debtor").

The Plan does not comply with the requirements of 11 U.S.C. § 1129, and, therefore, cannot be confirmed. Specifically, the Plan was proposed in bad faith and Debtor has acted in bad faith. On the eve of filing its bankruptcy petition, Debtor "distributed" all of its cash on hand, approximately $775,000.00, to its sole manager and member. Debtor transferred these funds at a time when the loan had already matured and the entire principal balance of the loan was due and owing. Debtor then took out an "unsecured loan" from its banker, Vern Padgett, to artificially create an impaired consenting class solely for purposes of "cramming down" MSDW's secured claim.

MSDW is presently owed nearly $10,600,00.00. In its Plan, Debtor proposes to re-amortize MSDW's claim over 30 years and make monthly payments of principal and interest at 4% per annum, with a balloon payment due at the end of the fifth year. However, 4% does not represent a market rate of interest, does not adequately compensate MSDW for the risks incurred under the Plan, and is otherwise inappropriate under the United States Supreme Court's decision in *Till v. SCS Credit Corp.*, 541 U.S. 465, 478-79 (2004). The value of Debtor's single asset property is simply not as high as Debtor purports. Moreover, Debtor's single tenant is facing substantial uncertainty in its own business, and its continued performance under the lease is anything but certain. The Court should not require MSDW to underwrite this risk (especially not at 4%).

This Objection is fully supported by the following Memorandum of Points and Authorities and the prior pleadings and papers filed in this case, all of which are incorporated herein by this reference.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **I.     FACTUAL AND PROCEDURAL BACKGROUND**

1.  On or about September 20, 1999, Debtor and MSDW's predecessor-in-interest entered into a Deed of Trust Note (the "Note"), which evidenced a loan to Debtor in the original principal amount of $10,350,000.00 (the "Loan"). A true and correct copy of the Note is attached as Exhibit A to the "Declaration of Don Kerr in Support of Motion for Relief from the Automatic Stay" (the "Declaration") [DE # 34], and incorporated herein by this reference.

2.  Pursuant to the Note, the Loan matured on October 1, 2009 and, absent an Event of Default, accrues interest at the rate of 8.37% per annum. *See* Declaration, Exhibit A at 1. Upon an Event of Default, the Note accrues interest at the rate of 15.37%. *See* Declaration, Exhibit A at 4.

3.  The Note is secured by, among other things, the Deed of Trust, Assignment of Leases, and Recorded Financing Statement, as defined in MSDW's "Motion for Relief from Automatic Stay; or, Alternatively, Request for Adequate Protection" (the "Motion for Relief") [DE # 33]. The Deed of Trust grants to MSDW a security interest in and to, among other things,

1  certain real property located in Maricopa County, Arizona (the "Property") and the lease and rents related thereto. True and correct copies of the Deed of Trust, Assignment of Leases, and Recorded Financing Statement are attached to the Declaration as Exhibits B, C, and D, respectively, and incorporated herein by this reference.

4. The Note matured on October 1, 2009, and Debtor failed to pay the amounts due and owing.

5. On July 7, 2010 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. D.E. # 1.

6. In the four months leading up to the Petition Date, Debtor transferred no less than $775,000.00 to C&H Development Co. ("C&H Development"), its sole member. *See* Statement of Financial Affairs, 3(c) & 21(b) [DE # 1]; *see also* Debtor's Bank Statements attached hereto as Exhibit A. Specifically, Debtor transferred $475,000.00 to C&H Development on June 15, 2010, less than three weeks before the Petition Date. *See* Statement of Financial Affairs, 3(c) [DE # 1]; *see also* Exhibit A at CHAZ00910 – CHAZ00911. On information and belief, these funds derived from rents paid to Debtor by its sole tenant, Robb & Stucky, and constituted MSDW's collateral.

7. Debtor has made no payments to MSDW during the course of these proceedings, and, in fact, has made no payments on the Loan since before it matured on October 1, 2009.

8. On or about June 25, 2010, ten days after depleting its cash reserves for the benefit of insiders and less than two weeks prior to the Petition Date, Debtor executed the Promissory Note dated June 25, 2010 (the "Padgett Note") in favor of Vern Padgett ("Padgett") in the original principal amount of $100,000.00, with a maturity of December 31, 2010, and an interest rate of 10%. A copy of the Padgett Note, as provided by Debtor, is attached hereto as Exhibit B. Pursuant to Debtor's Schedules and Statements, the Padgett Note is the basis for Padgett's unsecured non-priority claim in the amount of $100,000.00 (the "Padgett Claim"). *See* Schedule F [DE # 1].

9. On August 18, 2010, Debtor filed its Plan and Disclosure Statement. DE # 25, 26. The Plan provides for treatment of MSDW's claim as follows:

- 3 -

|   |   |   |
|---|---|---|
| | a. | Monthly principal and interest payments of MSDW's allowed secured claim amortized over 30 years at 4% interest for the first five years; and |
| | b. | A balloon payment of the remaining amount of MSDW's allowed secured claim to be paid on the fifth anniversary of the Effective Date. |
| 10. | | The Plan provides for treatment of the Padgett Claim as follows: |
| | c. | The Padgett Claim will accrue interest at 10%, compounded monthly; |
| | d. | Debtor will pay 50% of the principal and accrued interest immediately on the Effective Date; and |
| | e. | Debtor will pay all remaining amounts due, including accrued interest, six months from the Effective Date. |

11. On December 14, 2010, the Court entered an Order approving the Disclosure Statement and setting a hearing on January 20, 2011 at 11:00 a.m. for the confirmation hearing for the Plan.

## II. LEGAL ANALYSIS

### A. The Plan Fails to Satisfy the Requirements of 11 U.S.C. § 1129(a).

For a Chapter 11 plan to be confirmed, the plan proponent must prove by a preponderance of the evidence that the plan satisfies all of the elements of 11 U.S.C. § 1129. *In re L & J Anaheim Assoc.*, 995 F.2d 940, 942 (9th Cir.1993). The proponent of the plan bears the burden of proof on each element of 11 U.S.C. § 1129(a). *Id.* As demonstrated hereinafter, the Plan fails to satisfy several of the § 1129(a) elements, and therefore cannot be confirmed.

#### 1. Debtor has not Complied with the Applicable Provisions of Title 11.

Section 1129(a)(2) requires that the Debtor has complied with the provisions of the Bankruptcy Code. Debtor here has clearly violated the Code by making fraudulent transfers to insiders on the eve of bankruptcy and by failing to seek a return of those transfers through these proceedings.

#### 2. The Plan Violates § 1129(a)(3) because it was not Proposed in Good Faith.

Debtor may not satisfy § 1129 by manufacturing an impaired class for the sole purpose of

satisfying § 1129(a)(10) and thereby forcing the plan upon a truly impaired class that has voted to reject the plan. *In re Windsor on the River Assocs., Ltd.*, 7 F.3d 127, 130-132 (8th Cir. 1993); *In re Daly*, 167 B.R. 734, 737 (Bankr. D. Mass. 1994); *In re Willows Convalescent Centers Limited Partnership*, 151 Bankr. 220, 222-224 (D. Minn. 1991). A contrived and artificial impairment can be viewed either as a violation of the requirement that the plan be proposed in good faith under § 1129(a)(3) or as a violation of the requirement of an accepting impaired class under § 1129(a)(10), or as both. *Id.*; *see also Connecticut Gen. Life Ins. Co. v. Hotel Assocs. (In re Hotel Assocs.),* 165 B.R. 470, 475 (9th Cir. BAP 1994) ("[T]he act of impairment in an attempt to gerrymander a voting class of creditors is indicative of bad faith" for purposes of § 1129(a)(3).). An attempt by a debtor-in-possession to give favorable treatment to an insider is also violative of § 1129(a)(3). *See, e.g.*, *Matter of Barr*, 38 B.R. 323 (Bankr. E.D. Mich. 1984).

In this case, the Debtor's Plan has not been proposed in good faith, and thereby violates § 1129(a)(3). The Debtor has acted in bad faith, by making prepetition transfers to equity holders of over $775,000.00 of MSDW's collateral. The great majority of the money was transferred within days of the bankruptcy filing, and drained Debtors' operating accounts to nearly zero. Debtor made these transfers at a time when MSDW's loan was fully matured and due and owing. Debtor was insolvent at the time these transfers were made, yet has taken absolutely no steps to recover these monies. Indeed, the transfers are not mentioned in the disclosure statement and Debtor clearly does not intend to pursue these claims against insiders. On page 19 of the Disclosure Statement, Debtor states that it does not foresee any post-confirmation litigation with any third party except, perhaps, Robb & Stucky. This preferable treatment for insiders is unwarranted, and violates the good faith requirements of 1129(a)(3).

Debtor engaged in the transfers for the sole improper purpose of artificially creating an impaired consenting class. After making the transfers, Debtor incurred a $100,000 loan from an individual named Vern Padgett ("Padgett") on June 25, 2010, just days prior to filing for Chapter 11. According to Debtor's insider, Basil Christopoulos, the loan was incurred to pay for normal operating expenses during the pendency of the case. However, at his 2004 exam, Christopoulos could not identify with any specificity what the expenses required payment, how

much each expense cost, and could not explain why the loan was preferable to returning the $775,000 in pre-petition transfers. Vern Padgett is a Vice President at Presidio Bank, a Bank where Debtor's insiders, including its parent company C & H Development, and equitable owners, Basil and Constantine Christopoulos ("Insiders"), each maintain significant accounts. Both Presidio Bank and the Insiders have resisted providing information on these accounts, including the account into which the pre-petition Transfers were deposited, as well as the relationship of Padgett to the Insiders. His relationship with Debtor and its Insiders remains unclear. What is clear, however, is that the obligation to Padgett was undertaken while Debtor was insolvent and exclusively to interject an impaired consenting class into this two-party dispute. There was absolutely no legitimate business purpose for incurring the loan as Debtor distributed approximately eight times the amount of the loan in the days and weeks immediately preceding the filing.

The purported loan from Padgett accrues interest at 10% per annum and matured December 31, 2010. In its Plan, Debtor maintains Padgett's 10% interest rate, but proposes to artificially impair Padgett by paying half of the balance due (approximately $55,000) on the Effective Date, and the other half (approximately $58,000) in six months. This despite the fact that: (i) Debtor presently maintains: in excess of $500,000 in its operating accounts [*see* DE # 90]; (ii) is currently receiving rent from Robb & Stucky of in excess of $100,000 a month; (iii) under *its* Plan, would be paying MSDW only approximately $50,000 a month; and (iv) has NO other significant operating expenses. There is clearly no business justification for this treatment or artificial impairment.

### 3. The Plan Violates 1129(a)(7).

Section 1129(a)(7)(A) requires that each impaired class either: (i) accept the Plan; or (ii) receive property with a present value greater than or equal to the amount that creditor would receive under Chapter 7 if the property was liquidated on the effective date. Debtor's Plan cannot meet this requirement. For example, Debtor is presently holding in excess of $500,000 of MSDW's cash collateral in their operating accounts. While their Plan purports to pay MSDW the present value of its secured claim in the Property, it fails to account for the value of MSDW's

- 6 -

1 cash collateral. If the case were liquidated under Chapter 7, MSDW's cash collateral would
2 simply be abandoned.

3 Regardless, the proposed treatment violates not only §1129(a)(7)(B), but §§ 506 and
4 1129(b) as well. Debtor's proposed four percent (4%) interest rate clearly violates applicable
5 Supreme Court and Ninth Circuit case law. The Ninth Circuit has determined that the appropriate
6 discount rate for present value calculations must be analyzed on a case-by-case basis to assess the
7 risks associated with the Debtor and the security. *See In re Fowler*, 903 F.2d 694, 697 (9th Cir.
8 1990); *In re Camino Real Landscape Maint. Contractors, Inc.*, 818 F.2d 1503, 1505-06 (9th Cir.
9 1987). Specifically, the *In re Camino Real* Court stated that:

> The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

818 F.2d at 1505 (citing 5 *Collier on Bankruptcy* ¶ 1129.03[4][f][i], at 1129-65 (15th Ed. 1987)). To arrive at the proper discount rate, the Ninth Circuit has stated that the Court may start at a base rate of interest and "add[] a factor based on the risk of default and the nature of the security." *In re Fowler*, 903 F.2d at 697; *see also In re Camino Real*, 818 F.2d at 1508. This is precisely the approach adopted by the United State Supreme Court in calculating the appropriate discount rate in a Chapter 13 plan. *See Till v. SCS Credit Corp.*, 541 U.S. 465, 478-79 (2004). In *Till*, the Court stated that the discount rate should be determined by looking to the prime rate and adjusting for the risk involved. The risk calculation, according the Court, will depend on factors such as "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id*. at 479. "[E]vidence of market interest rates for similar loans is relevant in arriving at the appropriate risk factor." *In re Fowler*, 903 F.2d at 698.

As Chief Judge Marlar recognized in his recent Memorandum Opinion in *In re Bashas' Inc.*, 2:09-bk-16050 (August 13, 2010), Debtor bears the burden of establishing that its proposed discount rate satisfies the present value analysis. 2:09-bk-16050, August 13, 2010 Memorandum Decision at p. 58 (citing *Camino Real*, 818 F.2d at 1508). Debtor has presented <u>absolutely no evidence</u> that a 4% interest rate reflects a market rate, or is appropriate under the Ninth Circuit's

- 7 -

analyses in *Fowler* and *Camino Real*. Debtor has disclosed no witnesses and no report from an expert in support of its 4% interest rate.

A 4% interest rate simply cannot compensate MSDW for the risks associated with underwriting Debtor's property for the next five years. Presumably, the proposed rate assumes a substantial equity cushion in the Property, which Debtor simply cannot establish. According to Debtor's appraiser, the Property is valued at approximately $17 million, with a "go dark" value of $12.5 million. However, all of the comparable properties relied upon in Debtor's appraisal are for significantly smaller and more versatile spaces. Many of the tenants that occupy those spaces are national or regional chains whose businesses remain resilient despite the poor economy. In the off chance an Albertson's, for example, were to vacate one of those spaces, the landlord could replace the lease with a similar tenant (e.g., Safeway, Fry's) or a different anchor tenant, like a Best Buy or LA Fitness.

By contrast, because of its size, the layout of the building and certain zoning and parking restrictions, Debtor's property can only be used as a furniture store. In his 2004 exam, Basil Christopoulos admitted that if Robb & Stucky were to vacate, <u>it would likely be impossible to find another tenant to lease the space.</u> Given these complexities, the rent per sq. ft. or capitalization rates attributed to the comparables in Debtor's appraisal are simply inapplicable to Debtor's property. Indeed, MSDW's appraisal demonstrates that the value of the Property could be as little as $6.5 million in a go dark scenario. In any event, Debtor is simply mistaken concerning its assumption of a significant equity cushion.

Based on the information in its 10K and correspondence produced in discovery, Robb & Stucky appears to be experiencing significant financial difficulties of its own. It has already defaulted on its lease once and there can be no assurance that furniture sales will rebound, or that it will continue to perform under the modified lease. According to its 10K, Robb & Stucky has $38 million of long term debt coming due this year, as compared with only $2 million in the previous year. The debt originally expired in 2010 but Robb & Stucky was able to negotiate a one-year forbearance. However, there is no guaranty of further concessions. According to the 10K, partners in Robb & Stucky have seen their equity in the business fall substantially into the

- 8 -

red.

Based on the foregoing, a 4% interest rate is wildly inappropriate and does not come close to compensating MSDW for the risks associated with Debtor's Plan. Four percent does not reflect a market rate—to the contrary, 4% is unavailable for this type of loan anywhere in the market and is patently absurd. The Plan's failure to provide for an appropriate discount rate prohibits confirmation under 1129(a)(7)(B).[1]

### 4. The Plan Fails to Satisfy 1129(a)(8).

Pursuant to § 1129(a)(8), all impaired classes must accept a plan for it to be confirmed. MSDW is impaired under the Plan and will vote against the Plan. Therefore, the Plan fails to satisfy § 1129(a)(8).

### 5. The Plan Fails to Satisfy 1129(a)(10).

Unless all impaired classes consent, § 1129(a)(10) requires that at least one impaired class vote to accept the Plan, and the Plan may proceed to cramdown under § 1129(b). The only proof of claim filed in this matter is that of MSDW's.[2] In its Schedules, Debtor lists an unsecured claim of Padgett in the amount of $100,000, which according to the testimony of Basil Christopoulos at his 2004 exam, comprises the only other pre-petition obligation of Debtor. MSDW has objected to Padgett's claim on the basis that it is a disguised capital contribution of an insider, was artificially created solely for the purpose of creating an impaired consenting class, and should be subordinated and/or disallowed for voting purposes pursuant to § 1126(e).

As provided herein, Debtor cannot incur a liability solely for the purpose of artificially creating an impaired consenting class to satisfy § 1129(a)(10) and achieve a cramdown. Debtor incurred the loan to Padgett exclusively for this purpose, and therefore, it cannot serve as an impaired consenting class. Because Debtor has no other impaired creditors, the Plan fails to satisfy § 1129(a)(10) and may not be confirmed pursuant to § 1129(b).

### 6. The Plan is Not Feasible and Violates 1129(a)(11).

---

[1] MSDW is in the process of obtaining an expert opinion and will supplement this objection on the issue of an appropriate discount rate.

[2] Debtor also lists an unsecured debt to Traveler's Insurance. However, Christopoulos testified at his 2004 exam that this claim was paid. Even if it was not, the claim is small enough to fit into the Plan's "convenience class" and is unimpaired.

- 9 -

Subsection (a)(11) requires that the Plan proposed by the Debtor be feasible, and not likely to be followed by liquidation or further financial reorganization. "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the Debtor can possibly attain after confirmation." *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citation omitted). If a final payment, in the form of a "balloon" payment, is proposed to come from new financing to be acquired by the Debtor in the form of some new lending vehicle, then proof of feasibility is necessary. *In re Seasons Partners, LLC*, 2010 Bankr. LEXIS 3841 (Bankr. D. Ariz. Oct. 28, 2010). Whether that balloon payment can likely be made, and new financing acquired, requires credible evidence proving that obtaining that future financing is a reasonable likelihood. *See In re Inv. Co. of The Southwest, Inc.*, 341 B.R. 298, 311, 314, 316 (10th Cir. BAP 2006) (plan not feasible where there was no evidence to demonstrate how the debtor would be able to fund required balloon payments).

In this case, the feasibility of Debtor's Plan depends upon its ability to make a balloon payment of the remaining outstanding balance of MSDW's claim in the fifth year. However, Debtor cannot demonstrate this is likely to happen. Debtor's Insiders turned down several viable opportunities to refinance the Property pre-petition, apparently because they preferred to subject MSDW in a cramdown scenario, rather than incur any themselves. <u>According to Basil Christopoulos' testimony at his 2004 exam, immediately prior to the petition date, Debtor turned down an offer to refinance the Property with an attractive interest rate from National Bank of Arizona because it required the Insiders to pledge $1 million of additional collateral as well as execute personal guarantees.</u> Debtor can present absolutely no evidence that underwriting standards will change, or that its principals will be any more willing to "step to the plate" any time in the next five years. Indeed, interest rates have risen substantially since the filing. Moreover, the terms of Debtor's renegotiated lease with Robb & Stucky provide less cash flow than prior to the petition date.

Even under Debtor's plan, the eventual amount of the balloon payment will be greater in five years than the payoff prior to the bankruptcy. MSDW has continued to accrue interest at the

- 10 -

default rate since the filing of the petition. If Debtor is correct in its assumption that MSDW is oversecured, pursuant to § 506, MSDW is entitled to include all of its default interest, costs and attorneys' fees in calculating its allowed claim. Debtor cannot achieve an *Entz-White* style reinstatement, and thereby avoid the consequences of default, because, among other reasons, the loan matured pre-petition. *See e.g., In re Lighthouse Lodge, LLC*, 2010 Bankr. LEXIS 3663 (Bankr. N.D. Cal. 2010) (holding Debtor could not "cure" default where loan matured pre-petition and that in determining whether secured creditor should receive default interest rate on allowed claim, bankruptcy court should apply a presumption of allowability for the contracted for default rate, provided that the rate is not unenforceable under applicable nonbankruptcy law.); *see also General Electric Capital Corp. v. Future Media Productions. Inc.*, 536 F.3d 969, 974 (9th Cir. 2008). Even with payments of principal and interest for five years, the outstanding balance of MSDW's claim will still be more than it was immediately prior to the bankruptcy.

There is simply too much uncertainty regarding Debtor's ability to refinance or sell the Property. Therefore, the Plan cannot be confirmed.

### B. The Plan Is Not Fair and Equitable With Respect To MSDW's Secured Claim Pursuant To 11 U.S.C. § 1129(b)(2)(A).

If the Debtor satisfies all of the conditions of 11 U.S.C. § 1129(a), except § 1129(a)(8) (unanimous consent), a Chapter 11 plan may be confirmed if the plan satisfies the "cramdown" alternative to this condition found in 11 U.S.C. § 1129(b). Under § 1129(b), the Plan cannot "discriminate unfairly" against and must be "fair and equitable" towards each impaired class that has not accepted the Plan. *See In re Arnold and Baker Farms*, 177 B.R. 648 (9th Cir. BAP 1994), *aff'd*, 85 F.3d 1415 (9th Cir.1996), *cert. denied*, 519 U.S. 1054 (1997). As with § 1129(a), the plan proponent bears the burden of proof with respect to the § 1129(b) elements. *Id.* The Plan cannot be confirmed under § 1129(b) because the Debtor has not met the requirements of § 1129(a), and because the Plan fails to satisfy either of the cramdown requirements of § 1129(b)(1) and (2).

#### 1. The Plan Cannot Be Confirmed under § 1129(b)(2)(A)(i).

Confirmation of a plan under § 1129(b)(2)(A)(i) requires the Court to determine the appropriate discount rate that will provide for payment to the creditor such that the present value

- 11 -

of the payments by Debtor are equal to the value of the Property. This is subject to the same interest rate analysis set forth above under §1129(a)(7). Again, Debtor has provided absolutely no evidence to establish that a four percent (4%) interest rate for MSDW's secured claim is an appropriate discount rate. To the contrary, that rate is unavailable at market, and does not adequately compensate MSDW for the risk of default associated with Debtor's financial situation. The risk of default is high, and a four percent interest rate is patently inappropriate under *Till, Fowler* and *Camino Real.* Given the increased risks in this case, the case law requires that some higher interest rate be paid to MSDW.

Moreover, equity should not allow Debtor to continue to pay the Padgett claim at 10% while MSDW's claim is reduced to 4%. Padgett's claim is to be paid entirely out of MSDW's collateral under the Plan, and it is simply inequitable to treat MSDW's claim in a less favorable manner.

### 2. **MSDW's lien attaches to the cash on hand on the Petition Date, and cannot be "crammed-down".**

As of the Petition Date, Debtor had drained no less than $775,000.00 of MSDW's collateral from its bank accounts. Post-petition, Debtor has again accumulated over $500,000.00, all of which constitutes MSDW's collateral. Debtor must recover the fraudulently transferred funds, and MSDW's lien must attach. Debtor cannot seek to cramdown MSDW's interest in the cash. This is because the present value of MSDW's lien in the cash is precisely the value of the cash, not the value of the Property.

The Bankruptcy Appellate Panel in *In re Wiersma*, 324 B.R. 92, 112 (9th Cir. BAP 2005) (Marlar, J.), *affirmed,* 2007 WL 1073782 (9th Cir. 2007), said it best: "Cash is King". In that case, Debtor sought confirmation of a cramdown plan under § 1129(b)(2)(A)(iii) that proposed a "cows for cows" swap, i.e., certain of Debtor's cows subject to a creditor's security interest would be liquidated, and the creditor would receive a new lien of equal value on similar cows. However, Debtor's plan did not account for the fact that the cows had already been liquidated and that creditor's lien had attached to the proceeds of a resulting cash settlement. In affirming the lower court's denial of confirmation, the BAP commented that there could be "little argument on

- 12 -

appeal that the replacement cows are the indubitable equivalent of cash." *Id.* Likewise, in this case, Debtor cannot reasonably argue that MSDW is being offered an indubitable equivalent of the cash Debtor currently has on hand. Nor does Debtor account for the value of MSDW's lien in the cash in its accounts. Therefore, Debtor cannot cram down MSDW's lien in Debtor's cash.

### III. CONCLUSION

For the foregoing reasons, the Court should deny confirmation of the Debtor's Plan. MSDW reserves the right to supplement or amend this Objection upon the completion of discovery in this matter.

DATED this 18th day of January, 2011.

SNELL & WILMER L.L.P.


By  s/Nathan G. Kanute
    Robert R. Kinas
    Jonathan M. Saffer
    Nathan G. Kanute
    One South Church Street, Suite 1500
    Tucson, AZ 85701-1294
    Attorneys for MSDW 2000-Life 1 Stucky Store, LLC

Copy of the foregoing served electronically
or mailed by United States Postal Service
on January 18, 2011 to the following:

U.S. Trustee
Office of the U.S. Trustee
230 N. First Avenue
Suite 204
Phoenix, AZ 85003

Edwin B Stanley
Simbro & Stanley, PLC
8767 East Via De Commercio #103
Scottsdale, AZ 85258-3374
bstanley@simbroandstanley.com

Craig Solomon Ganz
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Suite 1100
Phoenix AZ 85016-9225
craig.ganz@gknet.com

 s/Clarrissa Palma

12426580

- 13 -